UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES,<br><br>　　Plaintiff,<br><br>v.<br><br>FRANKIE HARRIS,<br><br>　　Defendant. | Case No. 21-20552<br>Honorable Laurie J. Michelson |

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS [28]**

　　Two Detroit police officers stopped Frankie Harris after he drove through several stop signs. Harris did not have his license, registration, or proof of insurance with him. The officers handcuffed Harris and searched his pockets, where they found a straw and a small baggie of white powder. As one officer asked Harris several questions related to the drugs, another searched Harris' car and found a firearm.

　　Harris was indicted on one count of being a felon in possession of a firearm. (ECF No. 1.) Harris has moved to suppress the firearm retrieved from his car and the statements he made to the officer while detained. (ECF No. 28.) He contends that the search violated the Fourth Amendment because the officers did not have probable cause to search the vehicle, and that the officer's interrogation, in which he disclosed that there was a gun in the car, violated his Fifth Amendment *Miranda* rights. In response, the government states that the search of Harris' car was valid pursuant to both the automobile exception and the inventory search exception to the Fourth

Amendment warrant requirement. The government also argues that Harris was neither in custody or interrogated, as required by *Miranda*, and even if he was in custody, his statement was voluntary.

The Court held an evidentiary hearing on December 20, 2021 and heard from one of the police officers. The record also includes the officers' dash cam and body cam videos, reports from both officers, and Detroit Police Department procedures for inventorying a vehicle. The Court finds that, depending on which officer's account is credited, either the automobile exception or the inventory search exception applies to the search of Harris' car, so the firearm will not be suppressed. But it also finds that Harris was in custody when he was questioned by the senior officer, and that he was not given a *Miranda* warning, so his statements during that questioning will be suppressed. Thus Harris' motion is GRANTED IN PART AND DENIED IN PART.

I.

On April 28, 2021, Detroit Police Officers Raymond Chandler and Alexander Gunther were proactively patrolling near Lappin Street in Detroit and saw a car drive through several stop signs on Lappin. Chandler, who was driving the police car, turned on the police cruiser's overhead lights, and the driver pulled over. Chandler walked toward the driver's side window, and Gunther, the more senior officer, walked toward the passenger's side.

The officers saw Frankie Harris in the driver's seat. Chandler told Harris he was being stopped for running several stop signs, and asked for his license, registration, and proof of insurance. (Hrg. Ex. A, Chandler body cam at 0:59–1:03.)

2

Harris reached into the glove box and retrieved a title for the car, which he gave to Chandler. (*Id.* at 1:10–1:23.) Harris told Chandler he left his license at his house. (*Id.* at 1:24.) Harris also told Chandler his name, at which point Chandler told Harris to place both hands behind his head and exit the car. (*Id.* at 1:47–2:04.) As Harris exited the car, Chandler asked him whether there was anything illegal in the car. (*Id.* at 2:00–2:05.) Harris stated he did not have anything and that he was concerned about his daughter who was having a fight with her boyfriend. (*Id.* at 2:13.) Chandler placed Harris in handcuffs. (*Id.* at 2:14.) Chandler told Harris, "you're going to be detained for the time being, Mr. Harris. You're not under arrest." (*Id.* at 2:14–2:21.)

Chandler directed Harris to stand between Harris' car and the patrol car, where he started patting down Harris' pockets. (*Id.* at 2:45.) Chandler asked Harris about a straw that was sticking out of his pocket. (*Id.* at 2:49.) Gunther asked Harris whether he "snorts" and Harris acknowledged he did given some personal issues. (Hrg. Ex. B, Gunther body cam at 2:47–2:49.) So Gunther asked Harris if he had any baggies on him. (*Id.* at 3:12.) Harris pulled out a small baggie with white powder from his pocket. *Id.*

While Gunther returned to the patrol car to run the title (*id.* at 3:33), Chandler asked Harris if he had anything more than the baggie Harris gave to Gunther. (Hrg. Ex. A, Chandler body cam at 3:34.) Harris stated, "that was it." (*Id.* at 3:39.)

Gunther returned to Harris and Chandler and started searching inside Harris' pockets, where he found cash, and checked Harris' pant legs. (Hrg. Ex. B, Gunther body cam at 4:34–5:38.) Gunther walked back to the patrol car and unfolded one of

3

the retrieved dollar bills, and then asked Harris if he snorted using the bills. (*Id.* at 5:57.) He also asked Harris if the officers were "gonna find a sack in the car?" (*Id.* at 6:12.)

After Gunther entered Harris' information in the patrol car computer, he came back toward Chandler and Harris. At that point, Chandler walked to Harris' car and began to search it. (Hrg. Ex. A, Chandler body cam at 8:10.) Chandler eventually found a gun near the passenger's seat. (*Id.* at 13:45.)

As Chandler searched the car, Gunther asked Harris several questions: "what is going on with [the dope]?" (Hrg. Ex. B, Gunther body cam at 8:18); "you really gonna tell me you use and you got all these singles in your pocket?" (*id.* at 8:25); "where you getting your shit from?" (*id.* at 8:58); what is the name of his dealer (*id.* at 9:16); what does the dealer look like (*id.* at 9:21); how old is the dealer (*id.* at 9:24); did Harris buy the bag today (*id.* at 9:39, 11:49); how much did the bag cost (*id.* at 10:25); whether the substance was laced with fentanyl (*id.* at 10:38, 11:29); whether he has done "it" before and knows the difference between powder laced with fentanyl or without (*id.* at 11:36). Harris responded to Gunther's questions, and also told Gunther that he had a "thriller" in the car. (*Id.* at 10:42.)

The officers have somewhat different interpretations of what happened during their encounter with Harris. Chandler's report states that he asked Harris to step out of the car because he was driving without a license. (ECF No. 31-2, PageID.134.) Chandler states that after Harris gave Gunther the baggie of white powder, he conducted an "inventory [search] of the vehicle" and that Harris was placed under

4

arrest only after the firearm was found. (*Id.*) Chandler's testimony at the evidentiary hearing is consistent with his report. In contrast, Gunther's report states that Harris was placed under arrest after he told officers he did not have a license. (ECF No. 31-3, PageID.136.) Gunther also states that he conducted a search incident to arrest of Harris. (*Id.*) There is no dispute, however, that Harris was not given any *Miranda* warnings.

Harris was charged with being a felon in possession of a firearm. (ECF No. 1.) Harris moves to suppress the firearm and the statements he made after he was placed in handcuffs. (ECF No. 28.) He argues that the search of his car violates the Fourth Amendment, and his statements were obtained in violation of the Fifth Amendment as interpreted in *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

## II.

The Court will begin by considering Harris' arguments that the firearm should be suppressed and then turns to his arguments for suppressing the statements he made after he was removed from his car.

### A.

Harris does not claim that the initial traffic stop was unlawful under the Fourth Amendment (after all, the officers saw Harris commit a traffic infraction by driving through several stop signs). But Harris does argue that after he was stopped, Chandler improperly searched his vehicle in violation of the Fourth Amendment. As a result of this improper search, says Harris, the firearm that Chandler found should be suppressed.

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. This right is typically preserved by requiring government agents to obtain a warrant before conducting searches and seizures. *See id; see also California v. Carney*, 471 U.S. 386, 390 (1985). And the Constitution's protection against unreasonable searches and seizures extends to an individual's vehicle. But a vehicle is afforded a "lesser degree of protection" from warrantless searches and seizures and is accordingly subject to several exceptions to the warrant requirement. *Carney*, 471 U.S. at 390 (citing *Carroll v. U.S.*, 267 U.S. 132 (1925)). This means that though the officers did not have a warrant to search Harris' car, the search is still legal if it falls within such an exception.

Here, the officers have given slightly different accounts of the events leading up to the gun's discovery. Under Gunther's account, the automobile exception to the warrant requirement applies. And under Chandler's account, the inventory search exception applies. Thus, under either account, the search of Harris' car did not violate the Fourth Amendment.

The Court starts with Gunther's account, which was provided via a police report. (ECF No. 31-3.) Gunther states that Harris was arrested after he told the officers he did not have a license. (*Id.* at PageID.136.) After that, Gunther searched Harris incident to arrest. (*Id.*) Harris also pulled from his pants pocket a baggie containing white powder, which Gunther suspected to be cocaine. (ECF No. 31-3,

6

PageID.136; Hrg. Ex. B, Gunther body cam at 3:12.) Then, Chandler searched Harris' vehicle.

The Court finds that the automobile exception applies to the search of the vehicle based on Gunther's version of events. First, the officers had probable cause to arrest Harris after he stated he did not have a valid license on him. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001); *see also* Michigan Comp. Laws §§ 257.311, 257.901. Harris also agrees that the officers had probable cause to arrest him without a warrant at this point (which his counsel confirmed at the suppression hearing). (*See* ECF No. 28, PageID.103.)

The officers were then allowed to search Harris' person incident to his arrest. *See Arizona v. Gant*, 556 U.S. 332, 339 (2009) (search incident to arrest justifies "safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy"); *Chimel v. California*, 395 U.S. 752 (1969) ("[I]t is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction."); *United States v. Robinson*, 414 U.S. 218, 236–37 (1973) (upholding search of arrestee's person incident to lawful arrest even though search would have produced no further evidence of driving with revoked permit). The officers' lawful search of Harris' person revealed a straw, and Harris also voluntarily gave Gunther a small baggie of white powder from his pocket.

Still, the question is not whether the officers could lawfully search Harris' person and seize the baggie, but whether they could lawfully search Harris' vehicle and seize the gun. *United States v. Haywood*, 506 F. App'x 424, 427–428 (6th Cir.

7

2011). The Court finds that they could under the automobile exception. That exception allows an officer to "conduct a warrantless search of a vehicle if they have 'probable cause to believe that the vehicle contains evidence of a crime.'" *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007) (quoting *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998)). This search may include all parts of a legitimately stopped vehicle, including the trunk and all containers. *United States v. Burns*, 298 F.3d 523, 542 (6th Cir. 2002) (citing *United States v. Ross*, 456 U.S. 798, 825 (1982)). "Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *Smith*, 510 F.3d at 647–48. The existence of probable cause is judged under a totality-of-the-circumstances test based on the objective facts known to the officers at the time of the search. *Id.*

Under Gunther's account, the officers had probable cause to search Harris' car because of the suspected cocaine found on Harris. *United States v. Burns*, 298 F.3d 523, 542 (6th Cir. 2002) ("Once the bag of crack cocaine was found in plain view, the officers had probable cause to believe that other contraband might be in the car."); *United States v. Burnett*, 791 F.2d 64, 67 (6th Cir. 1986) ("Once the contraband [marijuana package] was found, officer Brady had every right to search the passenger area of the car, the trunk, and any and all containers which might conceal contraband."). In sum, if Harris was arrested as Gunther states he was, the straw and suspected cocaine were found pursuant to a valid search incident to arrest, and provided probable cause to search Harris' car for additional contraband. Thus, the automobile exception applies to the search and the firearm will not be suppressed.

8

But since Chandler had a different interpretation of what happened, the Court will also consider whether the search of Harris' vehicle was valid under his account. Chandler stated that Harris was not under arrest when he asked Harris to exit the car and placed him in handcuffs. Instead, Chandler states that the officers detained Harris and conducted a *Terry* pat down of him. *See Terry v. Ohio*, 392 U.S. 1, 30 (1968). At this point, the officers observed the straw in Harris' pocket and made the decision to impound his car. After deciding to impound the car, Chandler took an inventory of the vehicle, which revealed the firearm.

Per Chandler's version of events, the inventory search exception applies to the search of Harris' car. The Supreme Court has held that "inventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987); *see also United States v. Rogers*, 861 F. App'x 8, 16 (6th Cir. 2021). To conduct a valid inventory search, officers must follow department procedures for impounding and inventorying a vehicle. *See Rogers*, 861 F. App'x at 16; *see also Lumpkin*, 159 F.3d at 987; *Florida v. Wells*, 495 U.S. 1, 4 (1990). As the Sixth Circuit explains, "inventory searches are valid only to the extent that officers follow a standardized criteria . . . or established routine to assure that inventory searches are not a ruse for a general rummaging in order to discover incriminating evidence." *United States v. Hockenberry*, 730 F.3d 645, 659 (6th Cir. 2013). Department policy must be well-defined but need not be written to establish standardized criteria necessary for the inventory-search exception to apply. *United*

*States v. Alexander*, 954 F.3d 910, 915 (6th Cir. 2020) (citing *United States v. Tackett*, 486 F.3d 230, 233 (6th Cir. 2007)).

Here, Chandler testified that he followed Detroit Police Department procedures for impounding and inventorying vehicles. Chandler testified that when a person does not have a valid driver's license, like Harris, a DPD officer can choose to impound the car. DPD policy states that officers "may also have the inherent authority or other authority to cause for the removal of vehicles. For example, courts have upheld the impoundment of vehicles where [e]ither the owner was unknown or where the driver was not authorized to drive the vehicle." (ECF No. 31-4, PageID.142.) And Sixth Circuit case law supports the decision to impound a vehicle in situations where an authorized driver, like a driver with a valid license, is not present. *Hockenberry*, 730 F.3d at 660–61 (holding that officers acted within their discretion to impound a vehicle when none of the vehicle's occupants were authorized to drive the vehicle). So Chandler's decision to impound the vehicle was in line with DPD procedures and does not violate the Fourth Amendment.

Given Chandler's decision to impound Harris' car, Chandler was also reasonable in conducting an inventory search. Chandler testified that an inventory search is done when the decision to impound is made and before the tow truck arrives. DPD policy corroborates Chandler's understanding of when to conduct an inventory search. (ECF No. 31-4, PageID.136 ("Vehicles shall be inventoried by a member of the Detroit Police Department prior to being towed.").) And the scope of Chandler's search also followed DPD guidelines. (*See id.* ("The scope of an inventory search is limited to

the following: a. Areas of the vehicle that may contain property . . .").) Chandler searched areas of the car that "may contain property," which includes under and next to the seats where he found the firearm. So even if Harris was not arrested as stated by Chandler, the search of his car was still constitutional based on the inventory search exception.

Harris' Fourth Amendment rights were not violated by the officers' search of his car and so the firearm discovered in this search will not be suppressed.

B.

The Court now turns to the motion to suppress Harris' statements because he was not given a *Miranda* warning. Neither party disputes, and the body camera footage supports, that Harris did not receive a *Miranda* warning from either officer at any point during the incident. But the government argues that no *Miranda* warning was needed because Harris was not in custody or under arrest when he made statements to the officers. In the alternative, the government argues that if Harris was in custody, his statements regarding the firearm—that he had a "thriller" in the car— should not be suppressed because they were voluntary.

In *Miranda*, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). So the "procedural safeguards" of a *Miranda* warning are required only when a suspect is subject to "custodial interrogation." *See*

11

*id.* In other words, Harris must have been in custody and subject to "interrogation" for his statements to be suppressed under *Miranda*. Thus, the Court considers whether the officers were required to give Harris a *Miranda* warning for his statements to be used during trial.

The Court begins with the in-custody requirement. Though Harris was initially subject to a traffic stop, where the officers were not required to give a *Miranda* warning as a matter of course, there are several factors that support a finding that Harris should have received a *Miranda* warning before Gunther questioned him. *See Berkemer v. McCarty*, 468 U.S. 420, 441 (1984) ("If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*." (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983))).

Although the totality of the circumstances surrounding the questioning must be considered in deciding whether a police encounter was custodial, "the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994). There are several factors that help a Court make this inquiry, which include "the location of the interview; the length and manner of questioning; whether the individual possessed unrestrained freedom of movement during the interview; and whether the individual was told she need not answer the questions." *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009); *see also United States v. Swanson*, 341 F.3d 524, 529–530 (6th Cir. 2003).

The location of the interview and the length and manner of questioning weigh against finding that Harris was in custody. Harris was questioned on the side of the road in plain view of those passing by. This does not measure up to the coercive environment of a police station where an individual is isolated with the officers. *See Miranda*, 384 U.S. at 461. And the length of questioning also does not raise concerns as the whole encounter took place over several minutes.

On the other hand, Harris was handcuffed upon exiting the car. Handcuffs are a hallmark of formal arrest and make it impossible for Harris to have "unrestrained freedom of movement." *See Panak*, 552 F.3d at 465; *see also United States v. Ray*, 690 F. App'x 366, 372 (6th Cir. 2017) ("For starters, there is no dispute that Ray was handcuffed at the time and, thus, 'in custody' for *Miranda* purposes."); *New York v. Quarles*, 467 U.S. 649, 655 (1984) (holding that defendant was in custody under *Miranda* when he was handcuffed and surrounded by at least four police officers when the questioning took place).

It is true, as the government points out, that handcuffing an individual does not always transform an investigative detention into an arrest or necessarily exceed the scope of such a detention. The Sixth Circuit has made clear that handcuffing as a safety precaution "is appropriate even when police are merely detaining, but not arresting, a suspect." *United States v. Atchley*, 474 F.3d 840, 849 (6th Cir. 2007). "[T]he use of handcuffs [does not] exceed the bounds of a *Terry* stop, so long as the circumstances warrant that precaution." *Houston v. Clark Cnty. Sheriff Deputy John Does 1-5*, 174 F.3d 809, 815 (6th Cir. 1999).

13

But here, there was little reason to put Harris in handcuffs apart from taking him into custody or placing him under arrest. Harris was cooperative and followed all of Chandler's commands as he approached the car. Chandler testified that he routinely has individuals step out of the car when they do not have identification on them in case they give officers a fake name and attempt to flee. But Harris did not lead the officers on a chase or attempt to evade the stop, and there is nothing in the video footage that suggests he might have. *Cf. United States v. Phillips*, 146 F. Supp. 3d 837, 845–46 (E.D. Mich. 2015) (holding that the defendant was not in custody during questioning despite being in handcuffs because use of handcuffs was objectively reasonable given defendant's attempt to flee upon encountering the police). And when Harris opened the glove box to get the car title, both officers were able to observe the inside of the vehicle and the glove box and did not see any weapons. True, Chandler testified that he perceived Harris to be nervous during the initial stop and that Harris froze "for a slight moment" when first asked about having anything illegal in the car. But even crediting this testimony, nervousness is not a reliable indicator in the context of a traffic stop. *United States v. Calvetti*, 836 F.3d 654, 666 (6th Cir. 2016); *see United States v. Winters*, 782 F.3d 289, 299 (6th Cir. 2015) (collecting cases). Chandler also attributed Harris' talkativeness to nervousness. But this could easily be the result of stress, as Harris explained to officers that he was concerned about his daughter's safety. In all, the Court finds that there is little reason to have handcuffed Harris unless he was in custody or under arrest.

Chandler also did not testify that he feared for his safety or thought Harris might flee—only that he has individuals exit the car if they do not have identification so they cannot flee before their name is verified. Even if Chandler testified that he routinely handcuffs people in similar scenarios for safety or security reasons, the Court must evaluate the reasonableness of handcuffing an individual based on the facts of each case. *See Bennett v. City of Eastpointe*, 410 F.3d 810, 836 (6th Cir. 2005) ("[F]or the use of handcuffs during a *Terry* stop, the Fourth Amendment requires some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose, evaluated on the facts of each case."). And as explained above, the circumstances here do not warrant handcuffing Harris.

Gunther's report also indicates that Harris was in custody for *Miranda* purposes. Gunther states that Harris was "placed under arrest" after he told Chandler he did not have a driver's license and that he "conducted a search incident to arrest." (ECF No. 31-3, PageID.136.) Gunther is also the officer who questioned Harris while Chandler searched the car, so from his perspective, he was asking questions of someone who had already been arrested, which is the very definition of "in custody."

And what a police officer says to the individual matters to the in-custody inquiry. The Sixth Circuit has held that an encounter with officers is non-custodial when the officer tells the individual they are free to leave or to not answer questions. *United States v. Salvo*, 133 F.3d 943, 951 (6th Cir. 1998); *Swanson*, 341 F.3d at 530 ("Most important to our analysis, though is that Swanson was explicitly told by [the

15

officer] that he was not under arrest and that he did not have to speak with him if he did not choose to."); *Coomer v. Yukins*, 533 F.3d 477, 487 (6th Cir. 2008) ("[P]erhaps most significantly, [Officer] Kucyk testified that he told Coomer several times that she was not under arrest and that the police would leave if asked."). At no point did either officer tell Harris that he was free to leave or free to ignore officer questions. True, Chandler did tell Harris as he was exiting his vehicle that he was not under arrest but merely being detained, cutting against finding that Harris was in custody. But after that moment, it was Gunther, not Chandler, who was in charge of monitoring Harris. And it was Gunther, not Chandler, who questioned Harris. And according to Gunther's report, he believed that Harris was under arrest. Chandler also testified that Gunther was the more senior officer, and the Court has not been presented with any reason to disbelieve Gunther's account or believe Chandler's account over Gunther's. So Gunther stating that Harris was under arrest also weighs in favor of finding that Harris was in custody for *Miranda* purposes.

Given that Harris was placed in handcuffs, that there was little reason to handcuff Harris aside from arresting him, that the officers did not tell Harris that he was free to leave or not answer their questions, and the officer who questioned him believed he was under arrest, the Court finds that Harris was in custody for *Miranda* purposes.

Turning to the second prong of the *Miranda* test—whether Harris was interrogated—the Court finds that Gunther's questions amount to interrogation. Interrogation is defined as express questioning or its functional equivalent. *See*

16

*Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980). In other words, interrogation is a "practice that the police should know is reasonably likely to evoke an incriminating response from a suspect." *Id.* Gunther asked Harris questions such as "[are] we gonna find a sack in the car?" (Hrg. Ex. B, Gunther body camera at 6:13), "what's going on with your dope?" (*id.* at 8:20), "you're really going to tell me you use and you've got all these singles in your pocket?" (*id.* at 8:29), "where are you getting your shit from?" (*id.* at 8:59), and other details about who sold him the drugs, such as where they live, their age, and what they look like (*id.* at 9:20–26). This amounts to express questioning that officers should know is reasonably likely to evoke an incriminating response from Harris. And these were in addition to the questions Chandler asked initially about whether there was anything illegal in the car. (Hrg. Ex. A, Chandler body camera at 2:09); *see also United States v. Ashmore*, 609 F. App'x 306, 309–10, 217 (6th Cir. 2015) (affirming suppression of pre-*Miranda* statement that "the car might contain a revolver" in response to the question, "Do you have. . . any weapons on you or in the car?"). So, the Court finds that the officers' questioning of Harris was interrogation for *Miranda* purposes.

But, says the government, even if Harris was subject to a custodial interrogation, his statements regarding the firearm were voluntary because they were not related to the officers' questions. As an initial matter, Harris could not have voluntarily given a statement, and thus waived his *Miranda* rights, in response to express questioning if he was never apprised of his *Miranda* rights. *See, e.g., U.S. v. Adams*, 583 F.3d 467 (6th Cir. 2009) ("the relevant question is not whether the

17

criminal suspect [knew] and [understood] every possible consequence of a waiver of the Fifth Amendment privilege, but rather whether the suspect [knew] that he [could] choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking any time."). Harris could not have known about these rights if he was never informed of them.

And to the extent the government is arguing that Harris' statement about the "thriller" is voluntary because Gunther was not asking questions to elicit *this particular* incriminating response, this is too narrow of an understanding of *Miranda*. Courts have established exceptions to the *Miranda* rule where the expected response to the questioning is not incriminating. *See Hiibel v. Sixth Judicial Dist. Ct. of Nevada, Humboldt Cnty.*, 542 U.S. 177, 190 (2004) (holding that asking a suspect his name is not a violation of the Fifth Amendment or *Miranda* because it could not be used to establish his guilt). Here, however, Gunther asked Harris questions with expected answers that could be used against him.

The government points to no case, and the Court has not identified any case, where a pre-*Miranda* statement in response to custodial interrogation is not suppressed because it was not the particular incriminating response the officer was attempting to elicit. In fact, *Miranda* states that a warning or "fully effective equivalent" is a prerequisite to "the admissibility of *any* statement made by a defendant." *Miranda*, 384 U.S. at 476 (emphasis added). And *Miranda* makes clear that voluntariness of a statement turns on whether the statement is made in response to interrogation or not. *Id.* at 478 ("The fundamental import of the privilege while an

18

individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated."); *see also U.S. v. Cole*, 315 F.3d 633, 636 (6th Cir. 2003). And as established above, an officer should know that asking questions of an admitted drug user about where the drugs were bought and whether there are more drugs in his possession would elicit an incriminating response from a suspect. As Harris' statements were made in response to this interrogation, they are protected by *Miranda*.

In sum, the Court finds that Harris' statements regarding the drugs and the firearm should be suppressed as they were the product of custodial interrogation and he was not given a *Miranda* warning before he made them.

III.

Harris' motion to suppress will be GRANTED IN PART and DENIED IN PART. The Court will not suppress the firearm but will suppress Harris' statements about firearms and drugs made during Gunther's questioning. This includes Harris' statement that there was a thriller in the car.

SO ORDERED.

Dated: January 3, 2022

s/Laurie J. Michelson  
LAURIE J. MICHELSON  
UNITED STATES DISTRICT JUDGE